**SO ORDERED.**

**SIGNED this 17th day of August, 2012.**



Dale L. Somers
United States Bankruptcy Judge
_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| In re: | |
|---|---|
| **SCHUPBACH INVESTMENTS, LLC,** | CASE NO. 11-11425-11 |
| DEBTOR. | CHAPTER 11 |
| **JONATHAN ISAAC SCHUPBACH, AMY MARIE SCHUPBACH,** | CASE NO. 11-13633-11 CHAPTER 11C |
| DEBTORS. | |

**OPINION DENYING THE DEBTORS' REQUESTS FOR SUBSTANTIVE**

**CONSOLIDATION, BUT GRANTING THEIR REQUESTS**

**FOR JOINT ADMINISTRATION**

These matters were before the Court on January 9, 2012, for an evidentiary hearing

on the Debtors' motions for joint administration and substantive consolidation of their

cases.[1] Schupbach Investments, LLC ("the Company"), is owned by individual debtors Jonathan Isaac Schupbach and Amy Marie Schupbach. The Company appeared by counsel Mark J. Lazzo. The Schupbachs appeared by counsel David P. Eron of Eron Law Offices, P.A. Creditors Rose Hill Bank and Central National Bank filed objections to the motions, and other interested creditors apeared at the hearing. Rose Hill Bank appeared by counsel J. Michael Morris and Scott M. Hill of Klenda, Mitchell, Austerman & Zuercher, L.L.C. Central National Bank appeared by counsel Luke P. Sinclair of Gay, Riordan, Fincher, Munson & Sinclair, PA. Creditor Meritrust Credit Union appeared by counsel Eric D. Bruce of Bruce, Bruce & Lehman, L.L.C. Creditor Community Bank of Wichita, Inc., appeared by counsel Dennis V. Lacey of Nelson, Gunderson & Lacey. Creditor Bank of Commerce & Trust Company appeared by counsel William B. Sorensen, Jr., of Morris, Laing, Evans, Brock & Kennedy, Chartered. The United States Trustee appeared by Joyce Owen. There were no other appearances. The Court has heard the evidence and arguments of counsel, and has reviewed other relevant materials, and is now ready to rule.

**FACTS**

In 2001, the Schupbachs bought their first low-income residential rental property in the Wichita metro area, and they have added a large number of similar properties since

---

[1] The motion in the Company's case is Docket no. 205, and the one in the Schupbachs' case is Docket no. 70.

then. In 2004, they began what they called a "wholesale" side to their business, which involved buying, improving, and then selling rental properties to investors. For several years, this proved to be more profitable than the rental business.

In 2005, on the advice of an attorney, the Schupbachs formed the Company and began transferring both parts of their business to it. Mr. Schupbach testified the only reason they formed the limited liability company was to avoid personal liability in the event someone was injured on one of their rental properties.

The Schupbachs initially borrowed money in their own names to buy the properties, but after they formed the Company, the loans were obtained and the properties were titled in the Company's name. Each loan the Company obtained enabled it to buy a property, which the Company mortgaged as security for the loan. As is usual with limited liability companies owned by a married couple, the Schupbachs were required to guarantee the loans lenders made to the Company. By 2011, all the Schupbachs' business loans were in the name of the Company. The Schupbachs were the Company's only employees, but it also hired contractors on a full-time basis to help it service and maintain its properties.

The financial crisis that hit the economy in 2008 took a toll on the Company's business, especially the wholesale side. At the request of one or more of the lenders, the Schupbachs cut back on the Company's expenses by reducing its full-time contractors from eleven to four. Rose Hill Bank was the Company's main lender, and it suggested the Schupbachs should reduce their personal expenses as well, which they did by not

making their home mortgage payments. Nevertheless, two of the Company's lenders started foreclosure actions, and on May 16, 2011, the Company filed a Chapter 11 bankruptcy petition in Wichita. Mr. Schupbach testified they were trying to save the Company, and wanted to pay its creditors back. At that time, the Company had outstanding mortgage loans with nine banks, a credit union, and two private individuals. The loans totaled a little over $5 million.

Shortly after the Court ruled early in July 2011 that the Debtor could surrender some of its rental properties and use some of the cash collateral generated by the rest of its properties, several of the lenders started trying to enforce the Schupbachs' personal guarantees. Consequently, on July 16, 2011, the Schupbachs filed a joint Chapter 13 bankruptcy petition in Topeka. They filed a Chapter 13 plan that same day, proposing to surrender their homestead. They also agreed to surrender a 2009 Cadillac Escalade to a lender that had a lien on it. Several of the Schupbachs' creditors objected that the Schupbachs' debts exceeded the limits for Chapter 13, and on September 27, 2011, the Schupbachs filed a motion to convert their case to Chapter 11. The case proceeded in Chapter 13 until November 14, 2011, when Judge Karlin granted the Schupbachs' motion. In the same order, Judge Karlin granted Rose Hill Bank's request to transfer the case to the Wichita division of this Court. While the case was in Topeka, it was assigned Case No. 11-41120, but when it was transferred to Wichita, it was assigned Case No. 11-13633.

On October 3, 2011, the Company filed a motion to have its case jointly

administered with the Schupbachs' personal case, and to have its estate substantively consolidated with the Schupbachs' estates. The Schupbachs filed an identical motion in their personal case on the same day. Both motions asked to have the Company's attorney serve as counsel for the consolidated bankruptcy estate. Rose Hill Bank objected, among other things, that a Chapter 13 case could not be consolidated with a Chapter 11 case, but that part of its objection became moot in November when Judge Karlin converted the Schupbachs' case to Chapter 11.

On October 11, 2011, the Company filed a disclosure statement and a plan of reorganization. A major feature of the Company's plan called for the substantive consolidation of its bankruptcy estate with the Schupbachs' personal estates, for the property of the consolidated estates to vest in the Schupbachs on confirmation, and for the Schupbachs to personally own and operate the rental and wholesale business under the plan. Rose Hill Bank and Central National Bank both objected to consolidation. The Court held an evidentiary hearing on consolidation on January 9, 2012.

At the hearing, Mr. Schupbach testified that none of the Company's lenders ever asked for a financial statement from the Company, but only personal financial statements from him and his wife. However, he also said the Company's assets were listed on the personal financial statements.

A senior vice president of Rose Hill Bank, Larry Cohoon, testified that his bank regularly asked the Schupbachs for financial statements from the Company, but never received any. Nevertheless, from other sources, mainly lists of the Company's assets and

its rent rolls that were attached to the Schupbachs' personal financial statements, the bank obtained the information it needed to approve its loans to the Company. The bank knew the Company owned the rental properties used in the business. The rent rolls attached to the financial statements showed what each property was actually rented for, and Mr. Schupbach met with Cohoon when the Company's loans needed to be renewed to go over the rental situation for the properties that secured Rose Hill Bank's loans. The bank also received copies of the Company's tax returns. In addition, the Company made its loan payments to Rose Hill for several years. Cohoon said in making the loans to the Company, the bank relied on the Company's assets, the loan-to-value ratios its properties had, the value of the real properties themselves, and the Company's ongoing loan payments, as well as on Mr. Schupbach's ability as an operator.

Clinton Lawrence, a vice president of Bank of Commerce and Trust, gave similar testimony. He said that his bank received no separate financial statement from the Company, but that the Company's assets were listed separately on personal financial statements Mr. Schupbach gave him. Like Rose Hill, his bank relied on the loan-to-value ratios and the real properties themselves in making loans to the Company. He said a character issue is involved in making loans like those his bank made to the Company, and his experience with Mr. Schupbach over the years led him to believe Schupbach was a good operator of the Company's rental business.

The Company's tax returns for 2008, 2009, and 2010 were admitted into evidence. The 21-page 2008 return showed the Company made a gross profit of just under

6

$587,000, and a net ordinary business income for the year of $85,625. The 22-page 2009 return showed the Company made a gross profit of just over $678,000 and a net ordinary business income of $178,891. The 53-page 2010 return showed the Company made a gross profit of a little over $470,000 and a net ordinary business loss of $10,747. The 2010 return includes thirteen pages showing income and expenses for each of the Company's rental properties, and a seven-page "Depreciation Schedule by Category" that likewise lists the Company's rental properties. The copies presented at trial of the 2008 and 2009 returns did not include such attachments, nor did any testimony suggest the returns would have included them.

The Debtors' attorney asked both bank officers a hypothetical question about the loans their banks had made to the Company. He asked them to assume the Schupbachs, not the Company, had personally owned all the rental properties and the Company had not existed, and then asked whether their banks would have made the loans to the Schupbachs that they had made to the Company. Both officers conceded their banks would have made the loans.

On July 24, 2012, Rose Hill, Bank of Commerce, Central National Bank, Community Bank of Wichita, First National Bank of Hutchinson, Kansas State Bank, Legacy Bank, and Meritrust Credit Union filed a liquidating plan for the Company, along with a disclosure statement.[2]

---

[2]Docket nos. 294 & 295 in Case No. 11-11425.

**DISCUSSION**

The more significant part of the Debtors' motions asks to have their bankruptcy estates substantively consolidated. If granted, that request would have a much more substantial impact on the future of their bankruptcy cases than would joint administration. Consequently, the Court will address the substantive consolidation issue first.

**a. Standards for substantive consolidation.**

In 2005, the Third Circuit issued an opinion thoroughly reviewing the case law about substantive consolidation in bankruptcy, *In re Owens Corning*,³ which relied in part on a law review article by Mary Elisabeth Kors that provides a good discussion of the history of the activity.⁴ Kors, calling substantive consolidation a strange thing that happens in bankruptcy, defined it as: "the effective merger of two or more legally distinct (albeit affiliated) entities into a single debtor with a common pool of assets and a common body of liabilities."⁵

The Third Circuit noted that courts had almost unanimously agreed that substantive consolidation should be used sparingly, and that most had also followed either a rationale described by the Second Circuit in *Augie/Restivo Baking Company*,⁶ or one

---

³*In re Owens Corning*, 419 F.3d 195, 205-12 (3d Cir. 2005).

⁴Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. Pitt. L. Rev. 381 (Winter, 1998).

⁵*Id*. at 381.

⁶*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 516-17 (2d Cir.1988).

described by the D.C. Circuit in *Auto-Train Corporation*.[7] In *Augie/Restivo*, the Second Circuit concluded courts deciding whether to substantively consolidate entities in bankruptcy ultimately relied on one or the other of "two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."[8] In *Auto-Train*, the D.C. Circuit concluded that when substantive consolidation is sought, the moving party "must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit. At this point, a creditor may object on the grounds that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation. If a creditor makes such a showing, the court may order consolidation only if it determines that the demonstrated benefits of consolidation heavily outweigh the harm."[9]

The Third Circuit said the *Augie/Restivo* and *Auto-Train* standards were very similar, but complained the D.C. Circuit's *Auto-Train* test was too easily met. The Third Circuit then went on to specify more extensive principles it felt should guide courts faced with deciding whether to grant substantive consolidation:

(1) Limiting the cross-creep of liability by respecting entity separateness

---

[7]*Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270 (D.C. Cir. 1987).

[8]860 F.2d at 518 (internal quotation marks and citations omitted).

[9]810 F.2d at 276 (internal quotation marks and citations omitted).

9

>  is a fundamental ground rule. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.
>
> (2) The harms substantive consolidation addresses are nearly always those caused by debtors (and entities they control) who disregard separateness. Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (e.g., fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).
>
> (3) Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.
>
> (4) Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).
>
> (5) While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).[10]

The Court notes that the fifth principle makes clear the Third Circuit would not approve of the Debtors' effort to obtain substantive consolidation in order to eliminate the absolute priority rule as an obstacle to their reorganization efforts, one that gives the Company's creditors the power to prevent confirmation of any plan that would both

---

[10] 419 F.3d at 211 (internal quotation marks, citations, and footnote omitted).

(1) pay them less than the full amount they are owed and (2) allow the Company to remain the owner of its rental properties and the Schupbachs to retain their ownership and control of the Company.

As explained below, the Debtor's motions fail under any of the three approaches to substantive consolidation described here.

**b. The Debtors' evidence did not show this is one of the rare situations where substantive consolidation should be ordered.**

The Debtors ask the Court to find in their favor on the facet of the *Augie/Restivo* and *Auto-Train* standards that concern their creditors' alleged failure to rely on the separate identity of the Company in making the loans to their rental business. They argue their evidence showed that the lenders did not rely on the separate credit of the Company in making those loans. That was the intended thrust of the hypothetical question their attorney asked the bank officers who testified: if the Company had not existed and the Schupbachs had personally owed all the rental properties and other assets it had, would the banks have given them the same loans they made to the Company? But this is not the question to ask in order to determine whether the banks relied on the Company's separate existence or credit in making the loans. Instead, the appropriate hypothetical would have been to ask the bankers to assume that ownership of the business assets remained split between the Company and the Schupbachs personally as they chose to set their business up, but the Schupbachs had asked the banks to make the loans to them personally with no participation by the Company or direct offer of its assets to serve as security for the loans.

11

Of course, the answer to that question would clearly be "No." Even if the Schupbachs had offered a security interest in their ownership of the Company, the banks would not have been likely to make the loans because, unlike real property, ownership interests in a limited liability company cannot easily be sold if they must be foreclosed on, especially when the lender's foreclosure would almost certainly have deprived the company of the former owners' expertise at running the company's business. In essence, this hypothetical would have been asking if the Schupbachs' personal credit would have been sufficient to convince the banks to make the loans. Individuals like Warren Buffet, Bill Gates, or the Koch brothers might be able to get personal loans for a business they owned on such terms, but the Schupbachs could not. Their personal wealth would not have provided adequate security to convince the lenders to make the loans. There can be no doubt the banks and other lenders relied on the Company's ownership of the real properties it was buying with the loans they made to it and the mortgages it gave them on those properties when they decided to make the loans. The Debtors' hypothetical simply asked if the banks would have made the loans if they had been offered the same real property security and the same rental business operator as they were offered, but with a different ownership structure. While the bankers' affirmative answer to that question suggests the banks did not care how the Schupbachs structured the ownership of their business, that does not mean the banks did not actually rely on the separate existence and assets of the entity the Schupbachs themselves chose to create to hold the ownership of the real properties.

The Debtors suggest the Court should ignore the fact that the substantive consolidation they seek would enable them to reorganize their business free of the strictures of the absolute priority rule, based on this Court's ruling in *In re Roedemeier* that individual Chapter 11 debtors are not subject to that rule. But in a 1979 decision, the Tenth Circuit said a bankruptcy court's equitable power to order substantive consolidation does not allow the court to ignore the absolute priority rule.[11] In that case, the lower court's consolidation order would have eliminated several creditors' security interests in the stock of one of the debtors being consolidated and changed them into mere unsecured creditors of the resulting consolidated entity.[12] The Debtors are not proposing quite such a drastic change in their creditors' positions, but the consolidation they seek would, under *Roedemeier*, potentially allow the Schupbachs to retain ownership of their rental business without paying in full either the unsecured portions of their secured creditors' claims or their other unsecured creditors' claims.

In reality, the evidence made clear that the Company's lenders relied on the Company's ownership and mortgaging of the rental real properties, and relied on the Schupbachs' expertise and character as the operators of the Company's rental business. This does not mean they were not relying on the separate existence of the Company. As the bankers admitted, if the Company had not existed and the Schupbachs had personally owned the properties, the banks would still have made the loans. But for whatever

---

[11]*In re Gulfco Investment Corp.*, 593 F.2d 921, 926-27 (10th Cir. 1979).

[12]*Id*. at 923.

13

reason, the Schupbachs chose not to own and operate the business solely in their personal capacities, but to form the Company and legally separate some aspects of the business from themselves. The fact that choice is now an impediment to their reorganization effort is not a sufficient reason under any of the recognized standards to grant their request for substantive consolidation.

Rather than proving theirs is the rare case where substantive consolidation is justified, the Debtors' evidence showed their situation is not significantly different from that of any other small business corporation or limited liability company owned by an individual or married couple. In some ways, their lenders would treat them as a single economic unit by taking mortgages or security interests on the company's assets and personal guarantees from the individual or couple. But by making the loans in the company's name and taking mortgages and security interests in the company's name, as the lenders did in this case, the lenders are treating the company as existing separate from the individual or couple. In fact, any individual or married couple whose only major asset is a business operated through a corporation or limited liability company with substantial financing from banks and other lenders could probably provide evidence about the lenders' alleged failure to rely on the company's separate credit that is substantially similar to the evidence the Debtors presented here. The Court is not convinced such an individual or couple, having chosen to create a separate legal entity to own or otherwise deal with some aspects of their business, should be able to file bankruptcy and routinely obtain orders substantively consolidating their bankruptcy estates. But if the Court were

to grant substantive consolidation for these Debtors, it would be hard to envision a situation where an individual or couple and their company would not be able to obtain substantive consolidation.

**c. Joint administration will be granted.**

The Company's bankruptcy case was filed on May 16, 2011, and the Schupbachs' joint personal case was filed on July 16, 2011. The Debtors did not file their motions for joint administration until October 3, 2011, more than two months after the personal case was filed. The Debtors claim joint administration will significantly reduce administrative expenses, simplify the administration of their cases, and serve judicial economy. Rose Hill Bank, joined by Central National Bank, points out that the cases were filed at different times in different divisions in the District of Kansas, and that while the cases do involve some common creditors, there are also creditors whose claims are only involved in one of the cases. Rose Hill suggests there may be a conflict of interest between the bankruptcy estates of the Company and the Schupbachs because any transfers from the Company to the Schupbachs might be subject to avoidance by the Company's estate. The bank also notes the Company filed a disclosure statement and plan about a week after the Debtors asked for joint administration, but the Schupbachs had not filed a Chapter 11 plan by the time Rose Hill filed its objection on October 24. Of course, the Schupbachs case was not converted to Chapter 11 until November 14, so they could not have filed a Chapter 11 plan before that. Nevertheless, the Schupbachs have still not filed a Chapter 11 plan, although the plan the Company filed could have served as their plan, too, if the

15

Court had granted their request for substantive consolidation.

As relevant here, Federal Rule of Bankruptcy Procedure 1015(b) provides, "If a joint petition or two or more petitions are pending in the same court by or against (1) a husband and wife, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, the court may order a joint administration of the estates. Prior to entering an order the court shall give consideration to protecting creditors of different estates against potential conflicts of interest." Rule 1015(c) provides: "When an order for consolidation or joint administration of a joint case or two or more cases is entered pursuant to this rule, while protecting the rights of the parties under the Code, the court may enter orders as may tend to avoid unnecessary costs and delay."

The Court's decision to deny substantive consolidation eliminates some of the parties' arguments about joint administration. For example, the ruling means the Company's proposed Chapter 11 plan cannot be confirmed since it provides for substantive consolidation, which in turn means the Company will have to file a new plan before confirmation may be considered. The Schupbachs case has now been converted to Chapter 11, eliminating Rose Hill's concern about how a Chapter 11 case could be jointly administered with a Chapter 13 one, and there would be nothing to prevent the Schupbachs from filing a joint plan with the Company. In addition, the transfer of the Schupbachs' case to Wichita has resolved Rose Hill's concern that joint administration of cases pending in different divisions of this Court would not be feasible.

16

The Debtors' delay in asking for joint administration suggests it may not be necessary, and the fact they combined their request with their request for substantive consolidation may suggest they do not require it since the Court is denying substantive consolidation. In addition, the secured creditors of the Company have filed a disclosure statement and a liquidating plan for the Company that provides for the Schupbachs' interests in the Company to be extinguished. On the other hand, the Debtors do have many common creditors and the Debtors' financial circumstances are sufficiently intertwined that it appears unlikely the Company and the Schupbachs would propose anything but a joint plan. This means noticing costs, if nothing else, could be reduced by authorizing the Debtors to send a single joint notice of their disclosure statement and plan to their common creditors, and to do the same with other future activities in their cases. Rose Hill has not identified any actual conflict of interest, and because the Company is fully owned and operated by the Schupbachs, the Court believes it is unlikely that any conflict of interest will arise that would remain hidden if the cases are jointly administered but would be disclosed if the cases were separately administered.

Under the circumstances, the Court concludes that joint administration of these cases will reduce administrative costs, and will not cause any harm that would be avoided if joint administration were denied. Consequently, the Debtors' requests for joint administration of their cases will be granted.

**CONCLUSION**

For these reasons, the Court concludes the Debtors' requests for substantive

consolidation must be denied. Their requests for joint administration, however, will be granted. All future pleadings in the cases shall be captioned with the Company's name and case number, with the words "Joint Administration" under the case number.

This opinion constitutes a judgment resolving the Debtors' motions for substantive consolidation and joint administration and, pursuant to Federal Rule of Bankruptcy Procedure 9021, that judgment will become effective when it is entered on the docket in the Debtors' cases, pursuant to Bankruptcy Rule 5003.

# # #